UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHARLITA K. JONES,                          )
                                            )
Plaintiff,                                  )
                                            )
v.                                          )
                                            )        Case No. 4:13-CV-01007-RWS-SPM
                                            )
                                            )
CAROLYN W. COLVIN,                          )
Acting Commissioner of Social Security,     )
                                            )
Defendant.                                  )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the

application of Plaintiff Charlita K. Jones ("Plaintiff") for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). This matter

was referred to the undersigned United States Magistrate Judge for review and a recommended

disposition pursuant to 28 U.S.C. § 636(b). The undersigned recommends that the decision of the

Commissioner be reversed and the case remanded for further proceedings.

## I.    PROCEDURAL HISTORY

On August 27, 2010, Plaintiff applied for SSI, alleging that she had been unable to work

since January 1, 1992 due to rheumatoid arthritis. (Tr. 127-30, 163). On November 15, 2010, that

application was denied. (Tr. 74-78). On December 3, 2010, Plaintiff filed a Request for Hearing

by Administrative Law Judge (ALJ). (Tr. 79). After a hearing on February 7, 2012, the ALJ

issued an unfavorable decision dated March 8, 2012. (Tr. 59-73). Plaintiff filed a Request for

Review of Hearing Decision with the Social Security Administration's Appeals Council on May 3, 2012 (Tr. 7), but the Appeals Council denied the request for review on March 21, 2013. (Tr. 1-6). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.     FACTUAL BACKGROUND

### A. PLAINTIFF'S TESTIMONY

Plaintiff was 25 years old at the time of the hearing. (Tr. 14). She has had rheumatoid arthritis since childhood. (Tr. 22). Plaintiff has a tenth grade education and no GED. (Tr. 15). She has a cellphone and has a Facebook account, but she does not own or use a computer. (Tr. 17). Plaintiff last worked in 2010 at Costco as a food demonstrator, and before that she had several temporary clerical jobs and full-time jobs at Sears and Dillard's. (Tr. 19-21). She also worked at Popeye's for two weeks but quit because of the amount of standing that was required and the requirement that she clean. (Tr. 21). She testified that for most of her jobs, she either got fired or had to quit because of her rheumatoid arthritis. (Tr. 22).

Plaintiff's rheumatoid arthritis renders her unable to stand for long periods of time. (Tr. 22). When she sits for extended periods of time, her knees become stiff, her ankles swell, and her elbow locks up so that she cannot fully extend it. She cannot do a lot of lifting. (Tr. 23). Her knee pain and stiffness become worse when she climbs or descends stairs, sits too long, sleeps with her knees bent, or stands too long. (Tr. 33-34). Plaintiff wakes up with stiffness in her fingers that affects her ability to grip small objects, pick things up, and write. (Tr. 34). The stiffness lasts four to five hours, although submerging the swollen joints in hot water reduces the stiffness and pain. (Tr. 34-35). She also has to rest her hands during the day to regain function. (Tr. 34). She also has throbbing pain and stiffness in her right wrist, both knees, both ankles, and knuckles on

both hands. (Tr. 23, 33). She has trouble gripping items like cups and combing her hair due to the pain in her knuckles. (Tr. 36). The most comfortable position for her is lying across the couch. (Tr. 35). She can walk for about 15 minutes before needing to rest; can stand for 30 minutes at a time; can sit for an hour at a time; and can lift up to ten pounds. (Tr. 30).

Plaintiff frequently feels fatigued and describes her energy level as low. (Tr. 35). She generally takes two separate hour-long naps in the first half of the day. (Tr. 35-36).

Plaintiff testified that for a six-month period she was not taking her medication because she did not have insurance and could not afford the $1,000-per-month treatment. (Tr. 26). She also believes that her body has developed immunity to her medication due to the length of time she has been taking it. (Tr. 26-27).

Plaintiff can prepare meals that do not require much standing and can do dishes by hand sometimes. (Tr. 28-29). She also cares for her two children, one of whom has Down's syndrome. However, she sometimes needs assistance dressing her son, and his stepfather gets him on and off the bus to kindergarten each day. (Tr. 24-26). She does not vacuum, do yard work, or do laundry. (Tr. 29-30). Her mother and sister come over to do her laundry for her because she cannot walk down the steps to the basement. (Tr. 29, 31). Her sister and mother also drive her to the grocery store, where she rides in an electric cart and buys small items. (Tr. 30). She would not be able to take care of everything she does if it were not for the help provided by her sister, her mother, and her children's stepfather. (Tr. 36-37).

### B. MEDICAL EVIDENCE

On June 21, 2006, Plaintiff was seen by Andrew White, M.D. He noted that she had juvenile rheumatoid arthritis and had been seen frequently for joint injections through the years. She had been advised to stop her medications (methotrexate and Enbrel) during her recent

pregnancy, and she did not have joint problems during her pregnancy. However, in the three months since her baby was born, her knee pain and swelling had gotten so bad that and that she was having trouble walking. She was observed to limp onto the exam table. Her left knee was markedly swollen, and her right knee was swollen to a lesser extent. She was unable to extend her knees fully but otherwise had normal range of motion. (Tr. 230). Dr. White performed an aspiration of joint fluid from both of her knees, injected triamcinolone, and gave Plaintiff new prescriptions for methotrexate and Enbrel. (Tr. 228-30).

On December 28, 2007, Plaintiff went to St. Louis University Hospital and reported a two-month history of joint pain. (Tr. 326). She indicated that her pain was at a seven out of ten in her wrist, back, elbow, and ankle. (Tr. 329). It is unclear what treatment she received.

On January 14, 2008, Plaintiff saw Rama Bandlamudi, M.D., at St. Louis University's Division of Rheumatology. (Tr. 251-53). Plaintiff reported pain, swelling, stiffness, and decreased range of motion in her joints, in particular her elbows. (Tr. 252). On examination, she had some limited range of motion in her knees and elbows. (Tr. 253).

On January 16, 2008, X-rays showed no evidence of arthritis in her ankles or feet; mild soft tissue swelling in her hands and wrists; and no acute osseous abnormality in her elbows. (Tr. 258-64).

On February 11, 2008, Plaintiff saw Dr. Bandlamudi at St. Louis University and reported feeling improved after being on methotrexate. However, she reported morning stiffness for 60 minutes in her elbows and shoulder, as well as fatigue. On examination, she had swelling in both wrists and ankles. (Tr. 249).

On February 15, 2008, Dr. Bandlamudi and Dr. Purani Palaniswami wrote a letter summarizing Plaintiff's medical history and current and recent treatments. (Tr. 246-48). They

noted that Plaintiff would continue taking methotrexate because it was helping her, as well as folic acid and naproxen. They noted that Plaintiff's insurance might be increasing in March 2008 and might give her coverage for anti-TNF inhibitors. (Tr. 248).

On December 22, 2008, Plaintiff was examined by Elbert Cason, M.D. (Tr. 267-269). Plaintiff stated that she could walk two blocks, stand for two hours, and go up two flights of stairs. She could not squat but could bend over. Her medication helped somewhat. She was able to write, hold a coffee cup, and button her clothes. She indicated that on an average functional day, she washed dishes, did her own laundry, and took care of her son. (Tr. 267). Plaintiff could heel and toe stand and squat by holding onto the edge of the desk; her gait was normal; her back motion was normal; her straight leg raises were normal; her cervical spine motions were normal; her ankle motions were normal; her wrist motions were normal; her knee motions were normal; and she could use her fingers for buttoning, writing, and using small tools or parts. However, she could not completely straighten out her arms at the elbow. (Tr. 268). Dr. Cason found no evidence of joint swelling, inflammation, or tenderness. (Tr. 269).

On February 8, 2010, Plaintiff returned to St. Louis University, complaining of joint pain, swelling, fatigue, and weight loss. Physical examination showed swelling in her knees and pain in her shoulders, elbows, knees, and left ankle. (Tr. 274). It was noted that Plaintiff had not been seen there since 2008 and had been off of all of her medications for more than a year. (Tr. 275). She indicated that methotrexate and Naproxen had not been helpful and that she had previously been on Enbrel but had to stop for insurance reasons. (Tr. 274). It was noted that she would be started on Naproxen, would start methotrexate if her bloodwork was ok, and would start other medications if those were not enough. (Tr. 275).

On February 10, 2010, X-rays showed mild degenerative osteoarthritis and joint effusion in both knees and the right elbow (Tr. 280-81, 286); a small joint effusion in the left elbow (Tr. 287); no acute osseous pathology in the ankles or sacroiliac joints (Tr. 283-85); and stable heterotopic periarticular calcifications in the right ankle (Tr. 285).

On October 29, 2010, Plaintiff saw Raymond Leung, M.D. Plaintiff reported that she was able to walk one block and lift at most ten pounds. (Tr. 330). She was taking methotrexate, Enbrel, and Naproxen and stated that she had injections to her knees and ankle; she indicated that these treatments helped some. (Tr. 330). Plaintiff developed mild pain during the examination. (Tr. 331). Her gait was slow, with short strides and a moderate limp. She was able to walk 50 feet unassisted; could tandem walk; and could toe walk. She was not able to heel walk. She stated that she was not able to hop or squat and made no attempt to do so. She had decreased range of motion in a straight leg raise, in her right elbow, in both knees, and in both ankles. Her pinch strength, arm, leg, and grip strength were 4+/5 throughout. She had no difficulties getting on and off the exam table. Dr. Leung assessed rheumatoid arthritis; significant decreased range of motion at the right elbow, knees, and ankles; and slow gait with a moderate limp. He also stated that she was able to manipulate a small object with both hands fairly well. (Tr. 332).

On July 7, 2011, Plaintiff went to the Emergency Department of SSM DePaul, complaining of severe rheumatoid arthritis pain and inability to walk. (Tr. 362). She indicated that she had run out of her medications a month before. (Tr. 362-63). On examination, she had a normal range of motion and no significant joint swelling. (Tr. 364). She was given a one-month supply of medications. (Tr. 366).

On July 13, 2011, Plaintiff went to St. Louis University, reporting pain and swelling in several of her joints. It was noted that she "got insurance back so here today." (Tr. 385). She

reported morning stiffness that lasted until the afternoon. On examination, she had pain in her elbows, hips, and right knee, and swelling in her elbow. (Tr. 385). It was noted that she had "poor compliance due to losing her insurance" and had not been on any medications for six months. Her medications were continued. (Tr. 386). An X-ray of her left hand showed "erosions versus cysts within the triquetrum without other focal abnormality" (Tr. 395); an X-ray of her right hand showed no active joint disease (Tr. 404); an X-ray of her right elbow showed "joint effusion without evidence for erosion or focal demineralization" (Tr. 396); an X-ray of her left elbow "suggested small joint effusion" (Tr. 397); foot X-rays showed soft tissue swelling, complete loss of the posterior talocalcaneal joint space in the left foot, and other changes (Tr. 400-01); a right knee X-ray showed "erosive changes suggestive of inflammatory arthritis" (Tr. 402); and a left knee X-ray showed "findings suggestive of inflammatory arthritis" (Tr. 403).

On July 19, 2011, Dr. Bandlamudi and Stephanie Ingram, M.D., wrote another letter regarding Plaintiff's medical condition. (Tr. 382-383). They noted that at her July 13 visit, Plaintiff had tenderness and muscle spasm in several joints and crepitus in her bilateral knees. The doctors' impression was that she had inflammatory arthritis that was "poorly controlled due to medication noncompliance related to losing her insurance." (Tr. 383).

On December 21, 2011, Plaintiff went to St. Louis University, complaining of achiness, stiffness, and swelling in her knees, hands, fingers, and right elbow; pain walking; and hip pain for the past few months. (Tr. 380). On examination, she had swelling and pain in her elbows and knees. (Tr. 380). It was noted that she was very noncompliant with appointments and that there was progression "due to medication noncompliance." She was restarted on methotrexate, Enbrel, Naproxen, and Prednisone. Physical therapy was recommended. (Tr. 381).

## C. VOCATIONAL EVIDENCE

Vocational expert ("VE") Delores Alberta Gonzalez testified at Plaintiff's ALJ hearing. (Tr. 38). The VE testified that Plaintiff had worked in the past as a retail sales clerk (light, semiskilled work); a cashier (light, unskilled work); a general office clerk (light, semiskilled work); and a food demonstrator (light, semiskilled work). She testified that Plaintiff developed customer service, clerical, and computer skills in these jobs. (Tr. 40).

The ALJ first posed a hypothetical about an individual with Plaintiff's education, training, and work experience, who would be capable of "light work with a sit, stand option at the work site with the ability to change positions frequently, climb stairs and ramps occasionally, never climb ropes, ladders, scaffolds, stoop, kneel crouch, crawl occasionally." The individual would have to avoid concentrated exposure to extreme cold and wetness. The VE testified that such an individual would be capable of performing 25% of cashier positions (*DOT* code 211.462-010; light, unskilled, SVP 2[1]; 33,970 jobs in St. Louis before the 75% reduction). Another available job was order caller (*DOT* code 209.667-014; light, unskilled; 31,070 jobs in St. Louis). (Tr. 41).

In the second hypothetical, the ALJ added a limitation to only "frequent" handling, gross manipulation, fine manipulation, and fingering. The VE testified that this individual would be able to perform the jobs given for the first hypothetical. (Tr. 41).

In the third hypothetical, the ALJ added a limitation to only "occasional" handling, gross manipulation, fine manipulation, and fingering. The VE testified that such an individual would not be able to perform the jobs identified but could perform the jobs of call out operator (*DOT*

---

[1] "The SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance." *Hulsey v. Astrue*, 622 F.3d 917, 923 (8th Cir. 2010).

code 237.367-014; sedentary, unskilled; 320 jobs in St. Louis) and furniture rental consultant (*DOT* code 295.257-018; light, unskilled; 4,170 jobs in St. Louis) (Tr. 42). The VE testified that such an individual would not be able to perform the furniture rental consultant job if she could only lift ten pounds or less. (Tr. 43). In addition, if the person needed to take breaks beyond the normal breaks, she would not be able to work competitively. (Tr. 42-43).

### III.    STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a plaintiff must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. § 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not

disabled. 20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 416.920(e). At Step Four, the Commissioner determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. § 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.    <u>DECISION OF THE ALJ</u>

Applying the foregoing five-step analysis, the ALJ here found Plaintiff has not engaged in substantial gainful activity since August 27, 2010, the application date; has the severe impairment of rheumatoid arthritis in her knees, ankles, and elbows; and does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 64). He found that she has the RFC to perform light work with the following additional limitations: she can occasionally lift and/or carry twenty pounds; must have a sit/stand option at the work site with the ability to change positions frequently; can occasionally climb stairs and ramps; can occasionally stoop, kneel, crouch, and crawl; can never climb ropes, ladders, and scaffolds; must avoid concentrated exposure to the extreme cold and wetness; and is limited to no more than frequent handling, gross fingering, and fine manipulation.  (Tr. 65). He found that she is capable of performing her past relevant work as cashier. (Tr. 68). In the alternative, he found that Plaintiff could perform other jobs existing in significant numbers, such as cashier and order caller. (Tr. 69). He concluded therefore that she has not been under a disability, as defined in the Social Security Act, since August 27, 2010, the date the application was filed. (Tr. 69).

Plaintiff challenges the ALJ's decision on two grounds: (1) the ALJ failed to properly consider Plaintiff's RFC; and (2) the ALJ erred in assessing Plaintiff's past relevant work and her ability to perform other jobs existing in the national economy.

## V.  DISCUSSION

### A.  STANDARD FOR JUDICIAL REVIEW

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence on the record as a whole. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. THE ALJ'S RFC DETERMINATION

Plaintiff's first argument is that the ALJ failed to properly consider Plaintiff's RFC. Specifically, Plaintiff argues that the ALJ's credibility assessment was not supported by good reasons and that the ALJ failed to consider medical evidence that was consistent with Plaintiff's allegations of disabling physical limitations. The undersigned agrees and recommends that the case be reversed and remanded.

Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility based on the evidence as a whole, including the factors set forth in *Polaski v.Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007). The factors to be considered include "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'An ALJ who rejects subjective complaints must make an express credibility determination explaining the reason for discrediting the complaints.'" *Moore*, 572 F.3d at 524 (*quoting Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)). The ALJ's credibility determination must be "supported by good reasons and substantial evidence." *See Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) (quotation marks omitted). "When a plaintiff claims that the ALJ failed to properly consider subjective complaints of pain, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints

that the ALJ could discount his or her testimony as not credible." *Masterson v. Barnhart*, 363 F.3d 731, 738-39 (8th Cir. 2004). However, the court "will defer to the ALJ's credibility finding if the ALJ 'explicitly discredits a claimant's testimony and gives a good reason for doing so.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)).

Here, the ALJ did conduct a credibility analysis; however, it does not appear from the hearing decision that he considered all of the evidence relevant to Plaintiff's complaints, nor does the evidence he cited "so contradict[] the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson*, 363 F.3d 738-39.

First, it does not appear from the hearing decision that the ALJ considered all of the evidence relevant to Plaintiff's subjective complaints of pain. For example, in finding that Plaintiff's subjective complaints were not reasonably consistent with the medical evidence, the ALJ noted that "[i]maging of the claimant's feet, ankles, hands, wrists, and elbows did not show any acute osseous abnormality or evidence of arthritis" and cited X-ray findings from January 2008. (Tr. 65). However, he did not discuss the X-rays from July 2011 that *did* show inflammatory arthritis and other abnormalities, including a right knee X-ray showing "erosive changes suggestive of inflammatory arthritis" (Tr. 402), a left knee X-ray showing findings "suggestive of inflammatory arthritis" (Tr. 403), foot X-rays showing "complete loss of the posterior talocalcaneal joint space in the left foot, which may be related to chronic inflammatory disease" (Tr. 400-01); and X-rays of both elbows suggesting "joint effusion" (Tr. 396-97).

In addition, although the ALJ found that Plaintiff's noncompliance with recommendations regarding lab work and medications undermined the credibility of her complaints (Tr. 66), the record shows that Plaintiff and her treatment providers consistently

attributed her noncompliance to changes in her insurance status rather than to a lack of symptoms. (Tr. 26, 248, 274, 382-83, 385-86). The Eighth Circuit has recognized that a lack of sufficient financial resources may justify noncompliance with prescribed treatment in some cases. *See Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004). Because the hearing decision is silent on the question of how, if at all, Plaintiff's financial status affected her ability to comply with treatment recommendations, it is unclear whether the ALJ considered this evidence. Although the ALJ need not discuss every piece of evidence in the record, *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998), the ALJ's failure to discuss the significant evidence above leaves the undersigned unable to determine whether the ALJ considered it and discounted it or simply failed to consider it.

Second, the evidence the ALJ did discuss in the hearing decision does not so contradict Plaintiff's subjective complaints that the ALJ could discredit those complaints. For example, the ALJ indicated that he weighed "heavily" the findings from an October 2010 musculoskeletal examination, stating that it contained limited findings that showed that Plaintiff's impairments would not prevent work. (Tr. 66-67). However, this examination showed that Plaintiff had a "slow gait" and a "moderate limp"; had problems hopping, squatting, and heel walking; and had a significantly limited range of motion in her knee, ankles, and right elbow. (Tr. 332). These findings appear to support, rather than undermine, Plaintiff's claims of pain, stiffness, and fatigue; Plaintiff's claim that she cannot do a lot of standing, walking, or lifting; and Plaintiff's claim that she cannot extend her arms fully. (Tr. 22-23).

The ALJ also found it significant that "[d]espite complaints about disabling symptoms, [Plaintiff] had not had surgery on her elbows, knees, or hands." (Tr. 66). However, there is no indication in the record that any doctor ever recommended that Plaintiff have surgery or

indicated that surgery would be an appropriate treatment for her impairments. Thus, her failure to have surgery does not contradict her subjective complaints. *See Bowman v. Barnhart*, 310 F.3d 1080, 1084 (8th Cir. 2002) (holding that where no doctor had recommended surgery for the plaintiff's conditions, the ALJ erred in discounting allegations of disabling pain because the plaintiff had been treated medically, not surgically).

The ALJ additionally found that "[s]econdary gain issues may also be present," noting that Plaintiff reported being on her "son's disability" and not working herself in 2008. (Tr. 66, 247). The ALJ found that these facts "implie[d] that claimant could be attempting to portray more extensive limitations than are actually present in order to increase the chance of obtaining benefits." (Tr. 66, 247). The undersigned does not see how the fact that Plaintiff's son was receiving disability payments undermines the credibility of Plaintiff's complaints regarding the effects of her rheumatoid arthritis. In addition, the fact that she was not working herself in 2008, during the period when she alleges that she was disabled, is fully consistent with her subjective complaints. Moreover, the Eighth Circuit has "noted that 'all disability claimants are financially motivated to some extent.'" *O'Donnell v. Barnhart*, 318 F.3d 811, 817 (8th Cir. 2003) (quoting *Ramirez v. Barnhart*, 292 F.3d 576, 581 n. 4 (8th Cir. 2002)).

In addition to finding that Plaintiff's lack of work in 2008 undermined her credibility, the ALJ found that the fact that Plaintiff *did* work in 2008 and 2010 detracted from her credibility. (Tr. 66). The ability to work with an impairment may suggest that the impairment is not disabling, at least where there is no evidence of deterioration in the plaintiff's condition. *See Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) ("The fact that Goff worked with the impairments for over three years after her strokes, coupled with the absence of evidence of significant deterioration in her condition, demonstrate the impairments are not disabling in the present").

However, here, the objective medical evidence—including X-rays and musculoskeletal examinations—appears to suggest that Plaintiff's condition *did* deteriorate during the relevant time period. (Tr. 259-64, 280-87, 395-403; 267-69, 330-32). Moreover, the hearing decision is silent regarding evidence that Plaintiff's jobs in 2008 and 2010 lasted for only two to three months at a time and ended when Plaintiff was fired or had to quit due to limitations from her rheumatoid arthritis. (Tr. 22, 164, 191-92). Plaintiff's unsuccessful attempts to work despite her impairments do not undermine her credibility. *Cf. Brosnahan v. Barnhart,* 336 F.3d 671, 677 (8th Cir. 2003) (finding that a "good-faith attempt to return to work" did not undermine the plaintiff's credibility); *Dominguez v. Colvin*, No. 4:13-CV-1426-TCM, 2014 WL 3894495, at *19 (E.D. Mo. Aug. 8, 2014) ("If a lack of motivation to return to work detracts from a claimant's credibility, *see Fredrickson v. Barnhart*, 359 F.3d 972, 977 (8th Cir. 2004), Plaintiff's motivation to return should not also detract."). In light of these factors, Plaintiff's short-term jobs in 2008 and 2010 do not contradict Plaintiff's subjective complaints.

Finally, the ALJ also found that Plaintiff "can perform a full range of daily activities," including doing her own laundry, washing dishes, caring for her son who had Downs syndrome, and using a computer. (Tr. 66). However, the ALJ's statements that Plaintiff could do her own laundry and use a computer are directly contrary to her testimony, which indicates that Plaintiff's mother and sister come over on weekends to do her laundry for her and that Plaintiff does not have or use a computer. (Tr. 17, 29-31). In addition, the hearing decision does not address the evidence that Plaintiff could perform activities such as washing dishes and caring for her son only "sometimes" and only with assistance from her sister, mother, and children's stepfather. (Tr. 24-25, 29, 36-37, 186-87). The hearing decision also does not discuss Plaintiff's reports that she had difficulties with her own personal care due to her inability to extend her right elbow and

her knee problems. (Tr. 186). In sum, Plaintiff's ability to perform some light housework and child care "sometimes," with significant assistance from family members, does not discredit her claim that her pain, stiffness, and fatigue prevent her from performing work-related activities on an ongoing basis in a competitive environment. *See Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (noting that the Eighth Circuit "'has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work'" ) (quoting *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998)); *Ford v. Astrue*, 518 F.3d 979, 982-83 (8th Cir. 2008) (holding that the ALJ erred by finding that Plaintiff's reports of washing a few dishes, making three or four meals a week, ironing a few pieces of clothing, and reading were inconsistent with Plaintiff's complaints of disabling pain).

The undersigned acknowledges that some of the factors considered by the ALJ are supported by the record and do tend to undermine the credibility of Plaintiff's complaints, such as treatment notes indicating that her symptoms were controlled (at least to some extent) when she was on medication and evidence of gaps in her treatment record. (Tr. 66-67). However, in light of the issues outlined above, the undersigned cannot find that the ALJ considered all of the relevant evidence, that the evidence he cited so contradicts Plaintiff's subjective complaints that the ALJ could discount them, or that the credibility analysis is supported by good reasons and substantial evidence. *See Masterson*, 363 F.3d at 738-39. The undersigned further notes that the credibility analysis was particularly central to the RFC determination in this case, because Plaintiff's primary complaint was pain and because the record contains no opinion evidence directly addressing Plaintiff's ability to function in the workplace.

Because the RFC assessment was based in significant part on a flawed credibility analysis and because it appears that the ALJ did not consider some of the objective medical evidence that appears to support Plaintiff's complaints, the undersigned finds that the RFC is not supported by substantial evidence on the record as a whole. Thus, the undersigned recommends that the case be remanded for an appropriate analysis of the credibility of Plaintiff's subjective complaints and a re-assessment of Plaintiff's RFC.

## C.  THE ALJ'S FINDINGS AT STEPS FOUR AND FIVE

Plaintiff's second argument is that the ALJ erred in both his Step Four finding that she could perform her past relevant work as a cashier and in his alternative Step Five finding that she could perform other jobs existing in the national economy. The undersigned recognizes that the ALJ's reconsideration of Plaintiff's RFC on remand will affect his assessment of Plaintiff's ability to perform her past work and any other jobs that exist. Nevertheless, the undersigned will address the specific issues raised by Plaintiff.

The ALJ found at Step Four that Plaintiff could perform her past relevant work as a cashier. Plaintiff argues that she has no past relevant work. "Past relevant work is work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 416.960(b)(1); *see also Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009). Substantial gainful activity is "work activity that is both substantial and gainful." 20 C.F.R. § 416.972. Work is "substantial" if it "involves doing significant physical or mental activities," and it is "gainful" if it is "the kind of work usually done for pay or profit, whether or not a profit is realized." *Id.* For claimants who are employees, the regulations contain guidelines for determining the average monthly earnings that will "ordinarily show that [a claimant] has engaged in substantial gainful activity"; that amount varies

by year. 20 C.F.R. § 416.974(b); http://www.ssa.gov/oact/COLA/sga.html. Average monthly earnings below that amount "will ordinarily show" that a claimant has not engaged in substantial gainful activity. 20 C.F.R. § 416.974(b)(3).

The undersigned cannot determine from the record whether Plaintiff's 2005 cashier job constituted "past relevant work." First, it is unclear whether Plaintiff actually performed the cashier job at the substantial gainful activity level. For 2005, the average monthly earning level that generally shows substantial gainful activity is $830/month. *See* http://www.ssa.gov/OACT/COLA/sga.html. Plaintiff's earnings report indicates that she earned $2239.25 in 2005 (Tr. 145), which included both her earnings as a cashier/sales associate from "10/2005 to 11/2005" and her earnings doing clerical work for a temp agency from "4/05" through the end of the year (Tr. 164). However, the record does not show how much Plaintiff earned each month from her job *as a cashier* (as opposed to how much she earned as a temporary clerical worker) or whether the amount she earned as a cashier exceeded $830 per month in October and November.[2] Given this record and the lack of analysis of this issue by the ALJ, the undersigned does not find substantial evidence to support a finding that Plaintiff's work as a cashier constituted substantial gainful activity.

Moreover, it is unclear from the record whether Plaintiff's work as a cashier "lasted long enough for [her] to learn to do it." The vocational expert testified that Plaintiff's past job as a cashier has a Specific Vocational Preparation level of 2, which indicates that it can take up to a

---

[2] The Commissioner suggests that because Plaintiff reported in her job history that the cashier job was performed eight hours a day, six days a week at $8.50 per hour, her monthly earnings as a cashier would have exceeded $830.00 for the months when she was performing that job. (Tr. 164). However, the same job history states that Plaintiff worked at a temp agency from April 2005 through the end of the 2005, eight hours a day, seven days a week, at $7 per hour. (Tr. 164). If she had worked at both of those jobs for all of the reported hours, her 2005 earnings would have exceeded $17,000. Because her actual earnings for 2005 were only $2,239.25, it is clear that the daily and weekly hours listed on the job history report do not reflect amount she actually worked.

month to learn. (Tr. 41); *Dictionary of Occupational Titles* No. 211.462-010, 1991 WL 671840.

Given the way Plaintiff reported the days she worked, she could have worked as a cashier for as much as two months on a full-time basis or for as little as a few days. (Tr. 164). In light of the lack of evidence regarding how long Plaintiff worked as a cashier and the lack of evidence from the Vocational Expert regarding how long it takes to learn the cashier job, I do not find substantial evidence to support a finding that it lasted long enough for her to learn to do it.

Because the record lacks substantial evidence regarding whether Plaintiff's work as a cashier satisfies the requirements of "past relevant work," the ALJ's Step Four finding is not supported by substantial evidence.

The ALJ also made an alternative finding at Step Five that Plaintiff could perform jobs existing in the national economy that included cashier (*DOT* No. 211.462-01, 25% of the jobs available) and order caller (*DOT* No. 209.667-014). At Step Five, the Commissioner bears the burden of proving that there are a significant number of jobs available in the national economy that the claimant can perform. *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005); 20 C.F.R. § 416.960(c). In making this finding, the ALJ may rely on the testimony of a vocational expert in response to a hypothetical question that sets forth the claimant's impairments that are supported by substantial evidence in the record and accepted as true by the ALJ. *See Guillams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005); *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001).

Here, in making his Step Five finding, the ALJ relied on the testimony of the vocational expert in response to a hypothetical question that included the limitations that the ALJ found credible and included in Plaintiff's RFC. (Tr. 41). However, as discussed above, the RFC assessment on which the hypothetical question was based was not supported by substantial evidence and must be reconsidered on remand. On remand, after reconsidering Plaintiff's

credibility and RFC, the ALJ should ensure that any hypothetical question posed to the vocational expert includes all of Plaintiff's credible limitations that are supported by the record.

### VI. <u>CONCLUSION</u>

For the reasons set forth above, the undersigned finds that the decision of the Commissioner was not supported by substantial evidence. Accordingly,

**IT IS HEREBY RECOMMENDED** that decision of the Commissioner of Social Security be **REVERSED** and that this case be **REMANDED** under Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this Report and Recommendation.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this <u>29th</u> day of <u>August</u>, 2014